UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Shirley Ann Greer<br>3232 Truman Ave.,<br>North Charleston, SC 29405<br><br>and<br><br>Sara Swentko<br>P.O. Box 564<br>Republic, PA 15475<br><br>Individually and on Behalf of<br>All Others Similarly Situated,<br><br>     Plaintiffs,<br><br> v.<br><br>STERLING JEWELERS INC.,<br>375 Ghent Road,<br>Akron, Ohio 44333<br><br>  **Also serve:**<br>  CT Corp.<br>  1300 E. 9th Street<br>  Cleveland, Ohio 44114<br><br>     Defendant. | CASE NO:  5:19-cv-00920<br><br>JUDGE: |

### CLASS ACTION COMPLAINT

  Plaintiffs, Shirley Ann Greer and Sara Swentko (collectively, "Plaintiffs"), by and through their counsel, individually and on behalf of all other similarly-situated citizens of the United States, hereby bring this Complaint against Defendant Sterling Jewelers Inc. ("Sterling" or "Defendant") and respectfully allege as follows based upon personal knowledge, investigation of counsel, and information and belief:

## NATURE OF CASE

1. Since 1990, Sterling offered in-house credit financing directly to consumers to make purchases in its stores.

2. Consumers who visit Sterling's stores are typically encouraged by Sterling's salespeople to finance their purchases. Roughly 60% of Sterling's total sales are financed by consumers using Sterling's in-house credit. From 2014 through 2017, Sterling had over three million open credit accounts each year, and Sterling generated more than $300 million in net revenue each year from such accounts.

3. Sterling's company culture, reflected in its training materials and sales-performance standards, pressures employees to enroll consumers in company credit cards and to sell its financing plans and payment-protection insurance.

4. Plaintiffs bring this action on behalf of themselves and all others similarly situated under federal and Ohio law in connection with Sterling's credit-financing practices, including (1) submitting credit applications for consumers and causing credit cards to be issued without consumers' knowledge or consent; and (2) enrolling consumers in Payment Protection Plan ("PPP") insurance without their knowledge or consent.

## PARTIES

1. Plaintiff Shirley Ann Greer ("Greer") is an individual residing at 3232 Truman Ave., North Charleston, South Carolina 29405. Plaintiff Greer visited at least two of Defendant's stores in 2018 and during that time, a Kay Jewelers credit card account was opened without her consent or authorization causing her credit score to plummet.

2. Plaintiff Sara Swentko ("Swentko") is an individual residing in Republic, Pennsylvania. Plaintiff Swentko visited at least two of Defendant's stores in 2018. During her

visits, Defendant pressured Plaintiff Swentko to open a credit card account. She declined in all respects. Nonetheless, Defendant opened credit card accounts on behalf of Plaintiff Swentko, negatively affecting her credit score and causing her to default on payments.

3. Defendant, Sterling Jewelers Inc. is a corporation organized and existing under the laws of Ohio, maintaining its headquarters at 375 Ghent Road, Akron, Ohio 44333. Sterling's registered agent for service of process is: CT Corp. 1300 E. 9th Street, Cleveland, Ohio 44114.

4. Defendant Sterling does business throughout the United States and operates approximately 1,500 jewelry stores in malls and off-mall locations in all 50 states. Sterling does business under several names, including Kay Jewelers, Jared The Galleria of Jewelry, JB Robinson Jewelers, Marks & Morgan Jewelers, Belden Jewelers, Goodman Jewelers, LeRoy's Jewelers, Osterman Jewelers, Rogers Jewelers, Shaw's Jewelers, and Weisfield Jewelers.

5. Defendant Sterling is a wholly owned subsidiary of Signet Jewelers Limited ("Signet"), the largest specialty-jewelry retailer in the United States, Canada, and the United Kingdom. Defendant Sterling's annual sales account for more than 60% of Signet's total annual sales of about $6.4 billion.

6. Plaintiffs reserve the right to amend this Complaint to include any and all other corporations, business entities, or persons affiliated in any way with Defendant which are or may be responsible for or involved with the wrongful conduct alleged herein.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100

members, at least one of whom maintains citizenship in a state diverse from Defendant, and seeks in the aggregate more than $5,000,000, exclusive of interest and costs.

8. This Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1332, because they arise under the laws of the United States.

9. This Court has jurisdiction over the Ohio state law claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

10. This Court has personal jurisdiction over Defendant because Defendant is incorporated and headquartered in the State of Ohio.

11. Venue is proper under 28 U.S.C. § 1391(a), (b)(1), and (c)(2) because Defendant is subject to personal jurisdiction in, and a resident of, this Judicial District.

## BACKGROUND FACTS

12. Sterling offers consumers a credit card that provides a line of credit that can be used only at Sterling's stores; it is not a general-purpose credit card.

13. Signing up consumers for Sterling credit cards built brand loyalty and caused consumers to be more likely to purchase goods at Sterling's stores. According to one of Defendant's recent annual reports, "[t]he lifetime value of a customer obtained through the in-house credit program is estimated to be 3.5 times that of a customer not obtained through the in-house credit program."

14. In connection with offering its credit products, Sterling's salespeople misrepresented financing terms or omitted information necessary for consumers to understand the credit offer.

15. Store employees failed to inform consumers that they were applying for credit and misstated the reasons for requesting consumers' personal information.

16. In many instances, Sterling's sales representatives offered to "check" for a consumer whether the consumer qualified for a line of credit. In fact, the sales representative actually submitted a credit application for the consumer, without the consumers' knowledge or consent.

17. In many instances, Sterling's sales representatives told consumers when they applied for credit that there would be no "hard inquiry" or negative impact on their credit reports because Sterling offered "in-house" financing. In fact, for each application for credit from Sterling, Sterling made a credit-report inquiry.

18. In many instances, Sterling's sales representatives induced consumers to provide their personal information by purporting to sign up consumers for a store "rewards card," loyalty program, newsletter, or mailing list. In fact, the sales representatives used consumers' personal information to submit a credit application.

19. In other instances, Sterling's sales representatives informed consumers that they were collecting personal information for a "survey" or to place a custom order for the consumer when, in fact, the information was used to complete a credit application.

20. Many of Sterling's store managers and district managers encouraged deceptive tactics to induce consumers to apply for a credit card, and many turned a blind eye to such conduct.

21. For example, Sterling's store managers and district managers told sales representatives not to use the term "credit card" but instead refer to the credit card as a "store card" or a "Kay card."

22. Sterling's training materials instructed employees to offer credit to every customer who visited a store, and they included tips that enabled salespeople to distract the consumer, such as "offer to clean your Guest's jewelry while you fill out the credit application," and "completing the in-house credit account application for the Guest on the [in-store] tablet allows him/her to focus on his/her reason for visiting the Store, and not on completing paperwork."

23. Sterling's credit-card applications have been in both paper and electronic formats.

24. Sterling's training materials instruct employees to "[a]lways fill out the paper credit application or type the credit application into the Graphical POS for the Guest."

25. Because the credit card application usually was not completed by the consumer, but by a salesperson on paper or on the employee-operated electronic tablet, many consumers never saw their credit-card application or any applicable terms and conditions.

26. Sterling's employees experienced pressure to obtain and submit completed credit-card applications.

27. Employees were rated, retained, and compensated based on their ability to meet certain performance standards, including obtaining credit-card applications.

28. Sterling's companywide, formal performance standards required employees at stores located in shopping malls to complete "one credit card application a day." Employees at standalone stores were required to obtain one credit application every two days.

29. In some instances, employees who failed to meet the company's credit-application quota received counseling and additional training from store managers; other employees were terminated for failing to meet credit-application performance standards.

30. Bonuses for certain Sterling managers were determined, in part, based on the number of credit-card applications obtained by employees the managers supervised.

31. From 2013 through 2017, over one million Sterling credit-card accounts were opened based on applications completed and submitted in Sterling's stores and then never used by the consumers who had supposedly applied for them.

32. Until roughly June 2017, Sterling offered to its credit customers PPP insurance through a third-party insurance provider. PPP insurance was an optional credit-insurance program offered to Sterling credit customers to help them make their monthly payments in the event of death, disability, loss of property due to burglary or perils, or loss of work.

33. PPP insurance was offered at the point-of-sale in 33 states. Although the third-party administered PPP insurance, Sterling was responsible for the marketing and sale of PPP insurance.

34. PPP insurance generated significant revenues for Sterling. In fiscal year 2016, for example, PPP insurances sales generated more than $60 million in revenues.

35. PPP insurance was directly tied to the consumer's credit card because its function was to make monthly credit-card payments if the consumer met certain criteria. PPP insurance was not offered to customers, and could not exist, independent of the credit card.

36. In states where PPP insurance was offered, Sterling's employees were required to enroll customers in it to meet company performance standards.

37. Sterling's employees enrolled consumers in PPP insurance without their knowledge or consent. Consumers were asked to "sign here" or select "Yes" on an electronic "PIN-pad" in order to hold an item, process an order, or verify their information when, in fact, their signature was used to enroll them in PPP insurance.

38. Customers enrolled in PPP insurance at the store by electronically consenting to coverage on the PIN-pad they used to complete their purchase transaction.

39. The cost of PPP insurance varied depending on the type of coverage and state in which it was offered, but it averaged around $0.97 per $100 purchase or balance amount. This amount was charged monthly to the consumer's credit-card billing statement.

40. Often PPP insurance was added to consumers' accounts or purchases without their knowledge or consent.

41. Consumers did not realize that they were electing to purchase credit insurance on the PIN-pad, often noting that they assumed they were signing in connection with the purchase, special order, of, if they were aware of it, the credit application, which occurred at the same time and as part of the same transaction as PPP insurance enrollment.

42. Consumers only discovered that they were enrolled in, and were being charged for, PPP insurance after noticing it on their billing statements.

43. On January 16, 2019, the Consumer Financial Protection Bureau ("CFPB") announced that it had settled a claim against Sterling for violating the Consumer Financial Protection Act of 2010 by opening store credit-card accounts without customer consent; enrolling customers in PPP insurance without their consent; and misrepresenting to consumers the financing terms associated with the credit-card accounts. The CFPB also found that Sterling violated the Truth in Lending Act by signing customers up for credit-card accounts without having received an oral or written request or application for them (collectively, the "wrongful conduct").

44. Under the settlement with CFPB, Sterling agreed to pay a $10 million civil penalty to the CFPB, a $1 million civil penalty to the State of New York, and agreed to injunctive relief designed to prevent the continuation of the wrongful conduct.[1]

## CLASS ALLEGATIONS

56. This matter is brought by Plaintiffs on behalf of themselves and those similarly situated, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

57. The Class that Plaintiffs seek to represent is defined as follows:

> All citizens of the United States who had a credit card account opened without their consent and/or authorization in the five years preceding the filing of this Complaint (the "Class Period").

58. **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains thousands of members. The precise numbers of members can be ascertained through discovery, which will include Defendant's credit records, sales, and other records.

59. **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

60. For Plaintiffs and the Class, the common legal and factual questions include, but are not limited to the following:

   a. whether opening credit accounts without consent or authorization violates Federal and Ohio law;

   b. whether failing to disclose or providing false credit terms violates Federal and Ohio law;

---

[1] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-settles-claims-against-sterling-jewelers-inc/

  c. whether Defendant breached the covenant of good faith and fair dealing by opening credit accounts with consent and/or authorization and failing to disclose or providing false credit terms

  d. whether Defendant was unjustly enriched; and

  e. the proper measure of damages sustained by Plaintiffs and Class Members.

61. **Typicality:** The claims of Plaintiffs are typical of the claims of the members of the Class.  Plaintiffs and all the members of the Class have been injured by the same wrongful conduct of Sterling.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.  Plaintiffs have no interests adverse to the interests of other Class Members.

62. **Adequacy:** Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

63. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits.  The likelihood of individual Class Members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Further, individual members of the Class

do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Sterling has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

64. Plaintiffs do not anticipate any difficulty in the management of this litigation.

65. Sterling has, or has access to, addresses and/or other contact information for the members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## CAUSES OF ACTION

### *Count I*
### Violations of the Truth in Lending Act
### (15 U.S.C. § 1601, *et seq*.)

55. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

56. The purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601.

57. TILA is a consumer protection statute and is construed liberally in order to serve Congressional intent.

58.     Plaintiffs are "person[s]" and "consumer[s]" as defined by 15 U.S.C. § 1602(e), (i).

59.     Defendant is a "creditor" as defined by 15 U.S.C. § 1602(g).

60.     TILA provides that "[n]o credit card shall be issued except in response to a request or application therefor." 15 U.S.C. § 1642. Regulation Z states that no credit card may be issued to any person except in response to an oral or written request or application for the card. 12 C.F.R. § 1026.12(a)(1).

61.     TILA requires a creditor to clearly and conspicuously disclose certain information to the person who is obligated on a consumer credit transaction. 15 U.S.C. § 1631(a); 15 U.S.C. § 1632.

62.     Defendant issued credit cards to consumers, including Plaintiffs, without their knowledge or consent and not in response to an oral or written request for the card.

63.     For example, TILA requires a creditor to disclose: (1) the identity of the creditor making the disclosure; (2) the amount financed; (3) the finance charge; (4) the total sale price; (5) a statement of the consumer's right to obtain a written itemization of the amount financed; (6) a security interest statement; and (7) a statement regarding nonpayment, default, right to accelerate the maturity of the debt, and prepayment rebates and penalties. 15 U.S.C. § 1638.

64.     Defendant did not disclose to Plaintiffs and the Class the type of financing for which they were applying, as well as the applicable terms of the financing, such as the interest rate and monthly payment amount.

65.     Pursuant to 15 U.S.C. § 1640, Sterling is liable for actual damages an amount to be determined by the Court related to the frequency, persistence, and other factors of Defendant's violations, plus attorneys' fees and costs.

## *Count II*
## Violations of the Fair Credit Reporting Act
## (15 U.S.C. § 1681, *et seq*.)

66. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

67. Each time Sterling processes a credit application or extends a line of credit to consumers, it obtains, reviews, and uses a "consumer report," as that term is defined in 15 U.S.C. § 1681a(d), about the consumer for whom the credit application is filed or the line of credit is extended.

68. Sterling is required by 15 U.S.C. §§ 1681b, 1681n, and 1681o to refrain from obtaining or using consumer reports from Credit Reporting Agencies under false pretenses, and without proper authorization from the consumer who is the subject of the report.

69. Obtaining and using Plaintiffs' consumer reports in the process of submitting unauthorized credit applications or extending unauthorized lines of credit is not allowed pursuant to FCRA, and thus is a violation of federal law.

70. Sterling has a mandatory duty to use or obtain consumer reports only for permissible purposes. 15 U.S.C. § 1681b(f).

71. Despite these clear and unambiguous requirements of the FCRA, Defendant requests consumer reports regarding consumers, including Plaintiffs, without their knowledge or consent in order to submit unauthorized credit applications or extend unauthorized lines of credit as part of its company culture and practices, in violation of FCRA.

72. Pursuant to 15 U.S.C. §§ 1681n and 1681o, Sterling is liable for negligently and willfully violating FCRA by accessing the consumer reports without a permissible purpose or authorization under FCRA.

## *Count III*
## Violations of the Electronic Fund Transfer Act
### (15 U.S.C. § 1693, *et seq*.)

73. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

74. Congress created the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq*., in order to establish a framework to regulate electronic fund and remittance transfer systems, and to establish individual consumer rights related to electronic fund transfers.

75. Pursuant to the EFTA, "No person may issue to any consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than—(1) in response to a request or application therefor; or (2) as a renewal of, or in substitution for, an accepted card, code, or other means of access, whether issued by the initial issuer or a successor."  15 U.S.C. § 1693i(a).

76. Sterling violated this prohibition every time it issued a credit card from an unauthorized credit application.

77. Plaintiff and Class Members have received credit cards from Sterling when Plaintiff and Class Members have not requested or applied for such cards.

78. Pursuant to 15 U.S.C. § 1693m, Sterling is liable for actual damages, an amount to be determined by the Court related to the frequency, persistence, and other factors of Defendant's violations, plus attorneys' fees and costs.

## *Count IV*
## Violations of the Ohio Deceptive Trade Practices Act
### (OHIO REV. CODE § 4165.01, *et seq*.)

79. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

80. Defendant is a "person" as defined by Ohio Rev. Code § 4165.01.

81. The DTPA prohibits a person from causing a likelihood of confusion or misunderstanding "as to the source, sponsorship, approval, or certification of goods or services" in the course of the person's business, vocation, or occupation. OHIO REV. CODE § 4165.02(A)(2).

82. Sterling's sales representatives told consumers when they applied for credit that there would be no "hard inquiry" or negative impact on consumers' credit reports because Sterling offered "in-house" financing. In fact, for each application for credit from Sterling, Sterling made a credit-report inquiry, including inquiries for Plaintiffs.

83. In other instances, Sterling's sales representatives informed consumers that they were collecting their personal information for a "survey" or to place a custom order for the consumer when, in fact, the information was used to complete a credit application.

84. Sterling's conduct caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of Sterling's services in the course of Sterling's business.

85. Pursuant to Ohio Rev. Code § 4165.03(A)(2)-(A)(2)(B), Sterling is liable for actual damages, plus attorney's fees because Sterling willfully engaged and encouraged the unlawful trade practice knowing it to be deceptive.

### Count V
### Violations of the Ohio Consumer Sales Practices Act
### (OHIO REV. CODE § 1345.01, *et seq*.)

86. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

87. Plaintiffs are "consumer[s]" as defined by Ohio Rev. Code § 1345.01(D).

88. Defendant is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

89. The Ohio Consumer Sales Practices Act prohibits "unconscionable act[s] or practice[s] in connection with a consumer transaction" which relates to a supplier manipulating a consumer's understanding of the nature of the transaction at issue. OHIO REV. CODE § 1345.03(A).

90. Some of the circumstances taken into consideration in determining whether an act or practice is unconscionable include: (1) "Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;" (2) "Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;" and (3) "Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment[.]" OHIO REV. CODE § 1345.03(B)(3), (5), & (6).

91. Sterling's practices of signing up customers, including Plaintiffs, for credit cards and its failure to disclose key terms of credit agreements constitutes unconscionable conduct. Sterling knew at the time of the consumer transaction that a customer who did not know that Sterling was submitting a credit application or signing the customer up for a credit card would have an inability to receive a substantial benefit from that transaction. Moreover, Sterling's misrepresentations as to finance terms, monthly payments, and interest-free financing also prohibits customers from receiving a substantial benefit of the transaction. Similarly, Sterling required customers to enter into consumer transactions that Sterling knew were substantially one-sided when they opened credit accounts without the customers' permission or consent. Finally, all of Sterling's misrepresentations as to credit inquiries, submitting unauthorized credit

applications, and signing customers up for credit without their knowledge or consent are misrepresentations Sterling knew the customer would rely on to the customers' detriment.

92. Defendant was on notice that its conduct was unconscionable under the OCSPA. Ohio Rev. Code § 1349.17 prohibits sellers from giving out customers' social security numbers and other personal finance information. Sterling violated this statute when it submitted credit applications without the customers' permission, which included a customer's social security number or other personal finance information.

93. Moreover, Defendant was on notice that conduct was unlawful under the Truth in Lending Act, Fair Credit Reporting Act, and Electronic Fund Transfer Act, as described above in Counts I-III, respectively.

94. Pursuant to Ohio Rev. Code § 1345.09, Sterling is liable for noneconomic damages, actual economic damages, attorneys' fees, and other appropriate relief under Ohio Civil Rule 23.

## *Count VI*
## Breach of the Covenant of Good Faith and Fair Dealing

95. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

96. A duty of good faith arises where parties have a special or fiduciary relationship, and the claim sounds in tort rather than contract.

97. Plaintiffs and the Class Members had "no voice" in preparing the contract for credit, whether they were aware of the existence of the contract or not. There was a great disparity between the economic positions of the parties, favoring Sterling. Plaintiffs and the Class Members, who are not "sophisticated" parties, necessarily reposed a great amount of trust that Sterling would act in their best interest when handing over sensitive personal information.

Sterling took advantage of this trust when it used the consumers' sensitive personal information for unlawful and unauthorized purposes.

98. As such, Sterling breached the covenant of good faith and fair dealing sounding in tort and is liable for compensatory and punitive damages under Ohio law, as well as attorneys' fees and costs.

### Count VII
### Unjust Enrichment

99. Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

100. By signing up for credit with Sterling, whether knowingly or unknowingly, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of: (1) increasing Sterling's revenue because, according to one of Sterling's annual reports, the lifetime value of a customer obtained through its in-house credit program is estimated to be 3.5 times that of a customer not obtained through its in-house credit program; (2) particular Sterling employees meeting quotas or performance standards which included signing up consumers for a credit card, bearing directly on the employee's rating, retention, and compensation; (3) the payment of fees, penalties, and other charges resulting from credit accounts or services that Sterling unlawfully and/or deceptively opened for customers; and/or (4) purchasing the product based on Sterling's misrepresentations as to the financing terms, monthly payments, or interest-free financing, which were not honored.

101. Defendant appreciated the benefit because, were consumers not to knowingly or unknowingly obtain credit or purchase the product, Defendant would not have enjoyed the massive revenues acquired through its credit program and sales of products.

102. Defendant's knowledge, acceptance, and retention of the benefit is inequitable and unjust and violates the fundamental principles of justice, equity, and good conscience because the benefit was obtained by Defendant's fraudulent and misleading representations about its services.

103. Equity cannot in good conscience permit Defendant to be economically enriched for such actions at Plaintiffs' and the Class Members' expense and in violation of Ohio law, and therefore it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class Members for the monies paid and benefits conferred to Defendant as a result of its unlawful practices and conduct.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury of their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all similarly situated persons, pray for judgment against Defendant as follows:

    a. For an order certifying this case a class action;

    b. For an order appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

    c. For an order awarding compensatory damages to Plaintiffs and the putative Class, or, alternatively, require Defendant to disgorge or pay restitution of its ill-gotten gains, and pre- and post-judgment interest;

    d. For an order awarding reasonable and necessary attorneys' fees and costs;

    e. For an order awarding punitive damages to Plaintiffs and the putative Class for Defendant's fraudulent conduct and bad faith; and

f. For an order providing such further relief this Court deems just and proper.

Dated: April 23, 2019

Respectfully submitted,

 /s/   Robert J. Dubyak
Robert J. Dubyak (0059869)
Christina C. Spallina (0088548)
DUBYAK NELSON, LLC
6105 Parkland Boulevard, Suite 230
Cleveland, Ohio 44124
PH: (216) 364-0500 | FX: (216) 364-0505
EM: rdubyak@dubyaknelson.com
     cspallina@dubyaknelson.com

**STECKLER GRESHAM COCHRAN PLLC**
Dean Gresham (to be admitted *PHV*)
Bruce W. Steckler (to be admitted *PHV*)
L. Kirstine Rogers (to be admitted *PHV*)
12720 Hillcrest Rd., Ste. 1045
Dallas, TX 75230
(214) 300-1765
dean@stecklerlaw.com
krogers@stecklerlaw.com

*To be added Pro Hac Vice*

***Attorneys for Plaintiffs and the Proposed Class***